# In the United States Court of Federal Claims

No. 19-1817

(Filed: 19 April 2021)

```
*******************************************
PAKTIN CONSTRUCTION COMPANY,    *
                                *
              Plaintiff,        *    Statute of Limitations; 28 U.S.C. 2501;
                                *    Accrual Suspension Rule; Rule 12(b)(1);
v.                              *    Standing; Fifth Amendment; Taking Clause;
                                *    Substantial Connection Test.
THE UNITED STATES,              *
                                *
              Defendant.        *
                                *
*******************************************
```

*Daniel Marino*, Marino Finley LLP, of Washington, D.C., with whom was *Tillman Finley*, Marino Finley LLP, of Washington, D.C., for plaintiff.

*Miles Karson*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Joseph Hunt*, Assistant Attorney General, *Robert Kirschman, Jr*., Director, *Kenneth Dintzer*, Deputy Director, all of Washington DC, for defendant. *James Van Debergh*, U.S. Army Corps of Engineers, of Washington DC, Assistant Counsel for Litigation.

## OPINION AND ORDER

**HOLTE, Judge**

When the government engages in a long-running partnership with a foreign entity assisting the advancement of United States interests in a war zone, does the Constitution prohibit the government from taking the entity's property without just compensation? That is the question plaintiff presents to the Court. Afghan plaintiff Paktin Construction Company alleges the United States took its property without compensation in violation of the Fifth Amendment. Before 2011, plaintiff "maintained a business relationship with Coalition Forces in Afghanistan for many years," and plaintiff's work in the reconstruction and repair of local infrastructure damaged during the war was praised as "unparalleled thus far." According to plaintiff, in 2011, while it was working on a major development on behalf of the Army Corps of Engineers, the Army unilaterally terminated the contract and refused to return plaintiff's equipment or provide compensation. Plaintiff's efforts to retrieve its property continued for years, culminating in the Army instructing plaintiff to "never ask about the matter anymore" and leading to the present dispute. A foreign national receives constitutional protections when they operate within United States territory or have developed substantial connections with the United States over time. The government filed a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, arguing this Court does not have jurisdiction to entertain plaintiff's claim because plaintiff did not raise the claim within six years of its accrual and plaintiff does not have

substantial connections with the United States.  Based on the facts alleged, including that plaintiff was repeatedly recognized and appreciated by the United States government for almost ten years of contributions to the overseas efforts in Afghanistan, the Court finds plaintiff sufficiently pleads substantial connections to establish standing to sue under the Fifth Amendment.  For those and the following reasons elaborated in this Order, the Court **DENIES** the government's motion to dismiss.

## I.     Factual and Procedural History

### A.  Factual History

The Court draws the following facts from plaintiff's amended complaint, plaintiff's response to the government's motion to dismiss, and plaintiff's supplemental paper, assuming for the purpose of this motion all factual allegations are true.  *See, e.g.*, *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000) (when ruling on a motion to dismiss for failure to state a claim, this Court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences in [plaintiff's] favor").  Plaintiff is a construction company organized under the laws of Afghanistan and domiciled in Kabul, Afghanistan.  Am. Compl., ECF No. 11 at ¶ 2.  On 6 August 2011, plaintiff entered into an agreement to act as a subcontractor for Supreme Ideas-Highland Al Hujaz JV ("SI-HAH"), the prime contractor in the construction of a project for the United States Army Corp. of Engineers ("USACE") in the Paktia Province of Afghanistan.  Am. Compl. at ¶ 7.  Plaintiff was responsible for performing "planning and construction services under a scope of work . . . and schedule of values . . . for the USACE in accordance with the Prime Contract."  *See* Declaration of Rahmatullah Zaland ("Zaland Declaration"), ECF No. 16-1 at 1.

SI-HAH informed USACE plaintiff would serve as "the primary subcontractor on this project," and plaintiff's employees and representatives "attended and participated in the weekly meetings with USACE personnel regarding the project."  Zaland Declaration at 1.  Plaintiff's job site was subject to the control of the U.S. Army and USACE, and the United States restricted access to the job site to only authorized individuals.  Zaland Declaration at 1.  Plaintiff's work was subject to "inspection, testing and, ultimately, acceptance by the United States and the health and sanitary requirements of the USACE" through provisions of USACE's prime contract with SI-HAH.  Am. Compl. at ¶ 9.  Pursuant to the subcontractor agreement, plaintiff moved various construction supplies and equipment onto the worksite.  *Id*. at ¶ 10.[1]

On 25 January 2012, USACE sent a notice to SI-HAH demanding all work under the contract be stopped.  *Id*. at ¶ 11.  On the same day, SI-HAH directed plaintiff to stop work on the project and vacate the premises within 10 days of the notice.  *Id*. at ¶ 12.  SI-HAH further instructed plaintiff not to remove any materials from the construction site "until [SI-HAH] arranged an inventory procedure with the Government."  *Id*.  While there was "discussion of what amounts were owed and would be paid" to plaintiff and SI-HAH, plaintiff claims the U.S. Government never began a formal inventory procedure of the equipment and materials left at the

---

[1] The specific equipment and supplies plaintiff claims it moved to the job site include "mixers, compactors, vibrators, a welding machine, 207 tons of rebar, 500 bags of cement, piping, multiple generators, two 25,000-liter water tanks, and portable office and living quarters and facilities."  Am. Compl. at ¶ 10.

job site.  *See* Zaland Declaration at 2.  Plaintiff claims a "dispute arose over payments" due from SI-HAH to plaintiff which, along with "security concerns," prevented plaintiff from recovering its property during this time.  Am. Compl. at ¶ 13.

During the summer of 2013, plaintiff's CEO began inquiring whether he would be able to return to the site to retrieve plaintiff's construction equipment and materials.  Zaland Declaration at 2.  On 19 July 2013, plaintiff received an email from a representative of the U.S. military informing plaintiff it had until 22 July 2013 to remove some of its property from the construction site.  *See id.* at 21.  When plaintiff's CEO thereafter attempted to approach the construction site to remove its property, U.S. Government personnel informed plaintiff's CEO he could not enter the site or remove the equipment and threatened him with arrest should he attempt to return.  *Id.* at 2.

On 4 August 2013, a special agent with the United States Special Inspector General for Afghanistan Reconstruction communicated with United States military personnel on the subject of plaintiff's attempts to recover its property and requested clarification on the dispute.  *See id.* at 2, 22.  The special agent informed plaintiff at the time he "would contact a USACE commander and let [plaintiff] know what to do."  *Id.* at 2.  Plaintiff followed up with the special agent on 22 August 2013 and included an inventory list of property still on the construction site but received no response.  *Id.*  On 14 September 2013 the U.S. military representative plaintiff spoke with on 19 July 2013 stated the military representative "had nothing to do with any of [plaintiff's] property being confiscated and that he was not directing anyone to [confiscate plaintiff's property]."  *Id.*  Plaintiff requested contact information for a USACE representative who could return its equipment, but never obtained the requested information.  *Id.* at 2–3.

In December 2013, plaintiff's CEO first observed some Afghan National Army ("ANA") personnel using what the CEO believed to be plaintiff's property.  Zaland Declaration at 3.  On 24 December 2013, plaintiff's CEO met with USACE personnel and submitted documentation related to the equipment and materials plaintiff sought to recover.  *Id.*  USACE initially informed plaintiff it would "investigate" the matter, and later informed plaintiff USACE would return the property on 4 January 2014.  *Id.*  The government later informed plaintiff it gave plaintiff's property to the ANA, and plaintiff "should not ask about this matter anymore."  *Id.*  In April 2019 a commander of the ANA confirmed to plaintiff the U.S. Government gave plaintiff's property to the ANA.  *Id.*  Plaintiff has yet to recover the property left on the construction site or receive any compensation for the value of this property.  Am Compl. at ¶ 15–19.

### B.  Plaintiff's Past Construction Projects with the U.S. Government and Commendations for its Work

Before involvement in the USACE project related to plaintiff's claim, plaintiff worked with the United States government as both a primary contractor and subcontractor on numerous construction projects in Afghanistan.[2]  *See* Pl.'s Supp. Paper in Opp. to Def.'s Amended Mot. to

---

[2] During oral argument on the government's motion to dismiss, the Court raised a factual question regarding whether plaintiff had "any other connectivity with the United States in the past . . . other than the project of work that is described. . . in the complaint."  Tr. at 24:5–9.  Plaintiff's counsel was not prepared to provide such information at the oral argument.  Tr. at 25:7–12.  The Court accordingly permitted plaintiff to supplement the

Dismiss ("Pl.'s Supp. Paper"), ECF No. 28-1 at 2–5.  Plaintiff's past work on construction projects tied to the United States government and the government's commendations to plaintiff for this work are summarized in chronological order from 2004 to 2011.  *Id.*

Between 2004 and 2006, plaintiff worked as a subcontractor on four USAID-funded construction projects in various districts of Afghanistan.  *See* Pl.'s Supp. Paper at 2 (citing Exhibits for Proposed Supplemental Paper ("Supp. Paper Ex."), ECF No. 28-2 at Ex. A).

In 2007, plaintiff completed a contract with Task Force Diablo and the 4-73rd Cavalry of the 82nd Airborne Division of the U.S. Army to repair the Gul Ghondy High School in the Jaji District after it was damaged by the Pakistani military.  *See* Pl.'s Supp. Paper at 3 (citing Supp. Paper Ex. at Ex. E, Ex. F).  For this project, plaintiff received a letter from the United States Department of Defense ("DOD") on 7 September 2007 recognizing plaintiff's "capability and competence."  Supp. Paper Ex. at Ex. E.  Plaintiff also received a Letter of Recommendation from the DOD on 7 October 2007 referencing this project, in which a U.S. military officer wrote "[plaintiff] is highly recommended for future CMO / CERP funded projects sponsored by Coalition Forces."  Supp. Paper Ex. at Ex. F.

Plaintiff completed two construction projects in 2008 for the 506th Infantry Regiment, 4th Brigade Combat Team, 101st Airborne Division of the U.S. Army.  *See* Pl.'s Supp. Paper at 4 (citing Supp. Paper Ex. at Ex. H, Ex. I, Ex. J).  For both projects plaintiff received a Letter of Recommendation recognizing plaintiff's "capability and competence" by completing the project "on time and to the highest standard."  *See* Supp. Paper Ex. at Ex. H, Ex. I, Ex. J.  In a Letter of Recommendation from the DOD dated 1 February 2009, a U.S. military officer wrote "[plaintiff] has maintained a business relationship with Coalition Forces in Afghanistan for many years" and [plaintiff's] work [on projects tied to the U.S. government]. . . have been some of the best work I have seen throughout almost two years spent in Afghanistan."  Supp. Paper Ex. at Ex. I.

From 2008 to 2009, plaintiff completed three projects as a contractor for the 1st Squadron, 61st Cavalry Regiment, 101st Airborne Division of the U.S. Army.  Pl.'s Supp. Paper at 2–3 (citing Supp. Paper Ex. at Ex. D, Ex. G).  The Department of the Army issued a Memorandum of Recommendation to plaintiff on 22 May 2008, in which a U.S. military officer complemented plaintiff's "pro-active attitude, and fundamentally community minded approach to development projects."  Supp. Paper Ex. at Ex. G.  According to the Memorandum of Recommendation, the government paid plaintiff $65,038 and $4,318.75 for two different projects.  *Id.*  In another Memorandum of Recommendation plaintiff received on 4 March 2009 a U.S. military officer wrote "I recommend the use of [plaintiff] in all endeavors."  Supp. Paper Ex. at Ex. D.

Plaintiff completed two additional projects between 2008 to 2009 in the Kuchi and Logar provinces of Afghanistan as a contractor for the 506th Infantry Regiment, 4th Brigade Combat Team, 101st Airborne Division of the U.S. Army.  Pl.'s Supp. Paper at 4 (citing Supp. Paper Ex. at Ex. I, Ex. J, and Ex. K).  The U.S. Army noted "[plaintiff] began [one of] the project[s] before receiving initial payment and finished ahead of schedule," and plaintiff's performance "help[ed]

---

factual record with any additional projects it worked on for the United States other than the project which gave rise to plaintiff's claimed injury.  *See id.* at 25:11–13.

the people of Logar Province improve their quality of life and increase the legitimacy of the Afghan government." Supp. Paper Ex. at Ex. J.

In 2009, plaintiff contracted with the 3rd Brigade Special Troops Battalion, 10th Mountain Division of the U.S. Army to clear snow and ice from Tera Pass in the Logar Province of Afghanistan. Pl.'s Supp. Paper at 4 (citing Supp. Paper Ex. at Ex. I). The DOD issued a letter of recommendation for plaintiff on 1 February 2009 referencing plaintiff's work on the project as "unparalled thus far." Supp. Paper Ex. at Ex. I. The officer also noted plaintiff "has maintained a business relationship with Coalition Forces in Afghanistan for many years," and the officer has "been repeatedly impressed by their professionalism and technical capabilities." *Id.* In 2011, plaintiff contracted again with the 3rd Brigade Special Troops Battalion, 10th Mountain Division to clear snow and ice from Tera Pass in the Logar Province and received a Certificate of Appreciation from the U.S. Army for its work. Pl.'s Supp. Paper at 4; Supp. Paper Ex. at Ex. K.

From October 2009 to March 2010, plaintiff constructed cool storage buildings as a contractor for the 1-45th Oklahoma Agribusiness Development Team, U.S. Army. Pl.'s Supp. Paper at 2 (citing Supp. Paper Ex. at Ex. B, Ex. C). For this project, plaintiff received a letter from the DOD on 5 March 2010 expressing the government's appreciation for completing the construction in a "professional" and "extraordinary" manner. Supp. Paper Ex. at Ex. B. Plaintiff also received a Certificate of Appreciation from the Oklahoma Army National Guard expressing appreciation for plaintiff's contribution. Supp. Paper Ex. at Ex. C.

In 2011, plaintiff worked as a subcontractor for Paktya ADT to construct the Sayed Karam cool storage facility in Sayed Karam District, Paktia. Pl.'s Supp. Paper at 5 (citing Supp. Paper Ex. at Ex. L). The government issued Letter of Recommendation for plaintiff referencing plaintiff's contribution in this project. Supp. Paper Ex. at Ex. L.

### C. Procedural History

On 27 November 2019, plaintiff filed a complaint "seeking an award of just compensation under the Fifth Amendment of the Constitution of the United States" for the value of property allegedly taken for public use by the United States government. *See* Compl., ECF No. 1 at 1. On 10 April 2020, the government filed a motion to dismiss the complaint pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"). *See* Def.'s Mot. to Dismiss, ECF No. 10. On 1 May 2020 plaintiff filed an amended complaint, adding facts relating to alleged substantial connections with the United States. *See* Am. Compl. On 15 May 2020 the government filed a motion to dismiss the amended complaint pursuant to RCFC 12(b)(1). See Def.'s Amended Mot. to Dismiss ("Mot. to Dismiss"), ECF No. 14. Plaintiff filed its response to the government's amended motion to dismiss on 12 June 2020. *See* Pl.'s Opp. To Def.'s Am. Mot. to Dismiss ("Pl.'s Resp."), ECF No. 16. Plaintiff attached to its response to the government's amended motion to dismiss an affidavit from its CEO, which in part described the contract between plaintiff and SI-HAH and email correspondence between plaintiff's CEO and employees of the United States government. *See* Zaland Declaration. The government filed a reply in support of its motion to dismiss on 8 July 2020. *See* Def.'s Reply Br. in Supp. of its Mot. to Dismiss Pl.'s Amended Compl. ("Gov't's Reply"), ECF No. 19. The Court held oral argument on the government's motion to dismiss on 17 September 2020. *See* Order, ECF No.

21.  On 30 November 2020, in response to a factual question raised by the Court during oral argument, plaintiff filed a motion for leave to file a supplemental paper and attached the proposed supplemental paper to the motion.  *See* Pl.'s Mot. for Leave to File Supp. Paper ("Pl.'s Mot. for Leave"), ECF 28; Proposed Supp. Paper ("Pl.'s Supp. Paper"), ECF No. 28-1.  On 14 December 2020, the government responded to plaintiff's motion for leave to file supplemental brief.  *See* Def.'s Resp. to Pl.'s Mot. for Leave to File Supp. Paper ("Def.'s Resp. to Pls.'s Mot. for Leave"), ECF No. 29.  Plaintiff filed a reply in support of its motion for leave to file a supplemental brief on 21 December 2020.  *See* Pl.'s Reply in Support of Mot. for Leave to File Supp. Paper ("Pl.'s Reply in Support of Supp. Paper"), ECF 30.

## II.    Jurisdiction and Standard of Review

### A.  12(b)(1) Motion to Dismiss

Plaintiffs "bear the burden of establishing the court's jurisdiction by a preponderance of the evidence."  *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016) (citing *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011)).  "In determining jurisdiction, a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  *Id.* (quoting *Trusted Integration*, 659 F.3d at 1163) (internal quotation marks omitted).  "If a Rule 12(b)(1) motion simply challenges the court's subject matter jurisdiction based on the sufficiency of the pleading's allegations—that is, the movant presents a 'facial' attack on the pleading—then those allegations are taken as true and construed in a light most favorable to the complainant."  *Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); 2A James W. Moore et al., *Moore's Federal Practice* ¶ 12.07[2.-1], at 12-51 to -52 (1993)); *see also N. Hartland, L.L.C. v. United States*, 309 F. App'x 389, 391 (Fed. Cir. 2009) (citing *Scheuer,* 416 U.S. at 236; *Cedars-Sinai Medical Center*, 11 F.3d at 1583) (In affirming a dismissal order appealed from the Court of Federal Claims, the Federal Circuit explained, "[w]hen a Rule 12(b)(1) motion merely challenges the facial sufficiency of the pleadings to establish subject matter jurisdiction, this court takes the allegations in the pleadings as true and construes them in the light most favorable to the complainant.").  When presented with a challenge to the Court's jurisdiction "denying or controverting necessary judicial allegations . . . the court may consider evidence outside the pleadings to resolve the issue."  *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572 (Fed. Cir. 1996).

### B.  Establishing Article III Standing to Sue

"[S]tanding is a threshold jurisdictional issue."  *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102–04 (1998)).  "The Court of Federal Claims, though an Article I court, applies the same standing requirements enforced by other federal courts created under Article III."  *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) (internal citation omitted).  "The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  "Because Article III standing is jurisdictional, this court must consider the issue sua sponte even if not raised by the parties."  *Fuji Photo Film Co. v. Int'l Trade Comm'n*, 474 F.3d 1281, 1289 (Fed. Cir. 2007).

### C. The Statute of Limitations as a Jurisdictional Bar

"The Tucker Act, 28 U.S.C. § 1491 (a)(1), provides the Court of Federal Claims with jurisdiction over takings claims brought against the United States." *Casitas Mun. Water Dist. v. United States*, 708 F.3d 1340, 1359 (Fed. Cir. 2013) (citation omitted). "Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2012). Pursuant to Rule 12(h)(3) of the Rules of the United States Court of Federal Claims ("RCFC"), "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." RCFC 12(h)(3). "Because the statute of limitations is jurisdictional, the plaintiff bears the burden of proof." *Petro-Hunt, L.L.C. v. United States*, 862 F.3d 1370, 1378 (Fed. Cir. 2017).

## III.   Applicable Law

### A. Standing of a Foreign Company to Allege a Taking of Property in a Foreign Country[3]

The Supreme Court has limited the scope of constitutional protections offered outside the territory of the United States, rejecting "the view that every constitutional provision applies wherever the United States Government exercises its power." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 268–69 (1990). A foreign national "only. . . receive[s] constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." *Verdugo-Urquidez*, 494 U.S. at 271. The respondent in *Verdugo-Urquidez* was "an alien who has had no previous significant voluntary connection with the United States," and therefore the Court found he did not have standing to claim violations of the Fourth Amendment by U.S. government employees which allegedly occurred in Mexico and involved a Mexican citizen. *Id.*

#### i.   The Federal Circuit's "Substantial Connections" Test

Protections offered under the Takings Clause of the Fifth Amendment are similarly limited when claims involve a foreigner alleging a taking occurred outside the territorial jurisdiction of the United States. The Federal Circuit has ruled the Takings Clause protects

---

[3] 28 U.S.C. §2502(a), also known as the Reciprocity Act, mandates "[c]itizens or subjects of any foreign government which accords to citizens of the United States the right to prosecute claims against their government in its courts may sue the United States in the United States Court of Federal Claims if the subject matter of the suit is otherwise within such court's jurisdiction." During oral argument, the Court *sua sponte* raised the issue of plaintiff's standing under 28 U.S.C. §2502(a). Tr. at 79:14–80:1. Based on the government's research and government counsel conferring with the State Department and the Department of Justice lawyers in Afghanistan, the government expressed it has "no concerns to raise with respect to the applicability of the Reciprocity Act." Tr. at 80:6–9. Plaintiff informed the Court at oral argument of one case in Afghanistan where a U.S. company sued and prevailed against the Afghan government. Tr. at 80:19–21. Based on the representations made by both parties during oral argument on the government's motion to dismiss, the Court finds the Reciprocity Act does not bar plaintiff's claim.

property located outside the territorial jurisdiction of the United States but owned by an American citizen. *See Langenegger v. United States*, 756 F.2d 1565, 1570 (Fed. Cir. 1985) ("It is settled law that the United States is bound by our Constitution when it takes actions that affect citizens outside our territory . . . therefore the government must provide just compensation for takings by its forces which occur abroad, when not acts of war."). The Fifth Amendment similarly applies to the property of foreigners taken within the territorial boundaries of the United States. *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491–92 (1931) ("As alien friends are embraced within the terms of the Fifth Amendment, it cannot be said that their property is subject to confiscation here because the property of our citizens may be confiscated in the alien's country."). When a plaintiff alleging a Fifth Amendment violation is a foreign national and seeks restitution for a taking which occurred outside of the territorial jurisdiction of the United States, the Federal Circuit requires the plaintiff demonstrate adequate "significant connections" to the United States to establish standing. *Atamirzayeva v. United States*, 524 F.3d 1320, 1328 (Fed. Cir. 2008).

In *Atamirzayeva*, the Federal Circuit reviewed a case dismissal for lack of standing brought by a plaintiff who owned a cafeteria located on property next to the U.S. embassy in Uzbekistan. *Id.* at 1321–22. The plaintiff in *Atamirzayeva* brought a taking claim under the Fifth Amendment for compensation after her cafeteria was allegedly destroyed by Uzbekistani officials upon the United States government's request, the government sought to dismiss the case on the ground the plaintiff lacked standing to sue. *Id.* The Court of Federal Claims ruled the plaintiff "has not alleged substantial connections with the United States" and therefore "does not have standing to invoke the protection of the just compensation clause of the Fifth Amendment for an alleged taking by the United States." *Atamirzayeva v. United States*, 77 Fed. Cl. 378, 387 (2007). Referencing *Verdugo-Urquidez*, the Federal Circuit upheld the trial court's reliance on the "substantial connection test" to determine whether plaintiff had a right to relief under the Fifth Amendment. *Atamirzayeva*, 524 F.3d at 1325–26. Rejecting plaintiff's attempt to craft a "broad rule. . . under which a plaintiff could pursue a Takings Clause action for a taking of property in a foreign country even in the absence of any allegation of a relationship between the plaintiff and the United States," the Federal Circuit noted whether a plaintiff has standing to recover compensation for an alleged government taking of the foreign property of a foreign national must be based on "the facts of that case." *Id.* at 1328–29.

Prior to the Supreme Court's decision in *Verdugo-Urquidez*, the Court of Claims extended the protections of the Fifth Amendment to a takings claim brought by a Philippine corporation for the alleged taking of property in the Philippines. *See Turney v. United States*, 126 Ct. Cl. 202, 215 (1953). The Court of Claims upheld standing to sue under the Fifth Amendment, stating the just compensation clause applied to the particular "taking abroad" the plaintiffs in *Turney* presented the court. *Id.* In *Atamirzayeva*, the Federal Circuit examined the extraterritorial application of the Fifth Amendment under *Verdugo-Urquidez* and explained *Turney* does not conflict with the requirements for standing expressed in *Verdugo-Urquidez*, because the Philippine corporation suing for the alleged taking in *Turney* "had three significant connections to the United States" which, when considered "under the facts of that case," meant "providing a right to seek just compensation was appropriate." *Atamirzayeva*, 524 F.3d at 1328. As the Federal Circuit stated *Turney* was still good law after *Verdugo-Urquidez*, the protections of the Fifth Amendment are available to a foreign plaintiff who has substantial connections with

the United States and is claiming a taking occurred outside the territory of the United States.  *See id.*  In *Atamirzayeva,* the Federal Circuit highlighted three significant connections the *Turney* plaintiff had with the United States:  (1) whether the corporation "had been formed by two United States citizens"; (2) whether the corporation "received its ownership interest in the surplus property by assignment from those United States citizens"; and (3) after liquidation of the corporation, whether "a United States citizen was appointed as the liquidating trustee and the plaintiff in the Court of Claims action."  *Id.*  Recognizing the "significant connections" the *Turney* claimant had with the United States, the *Atamirzayeva* court explained "[t]he sounder approach is to treat the holding in *Turney* as limited to the proposition that providing a right to seek just compensation was appropriate under the facts of that case."  *Id.*

### ii.  Applications of the Substantial Connections Test by the Court of Federal Claims

Following *Atamirzayeva,* the Court of Federal Claims has applied the Federal Circuit's substantial connections test to determine whether foreign plaintiffs have adequate standing to bring a claim for an alleged government taking occurring outside the territorial jurisdiction of the United States.  In *Doe v. United States*, an Iraqi citizen who previously provided intelligence assistance to the United States sought to bring a Fifth Amendment takings claim for the occupation of his home by the United States military.  95 Fed. Cl. 546, 551 (2010).  The court in *Doe* concluded "the circumstances that underlie plaintiff's takings claim do not satisfy the *Verdugo-Urquidez* substantial connections test."  *Id.* at 575.  Applying the standard the Federal Circuit established in *Atamirzayeva* and considering the "three significant connections to the United States" the plaintiff relied on to establish standing in *Turney*, the court in *Doe* concluded plaintiff's assertions "are not sufficient to establish plaintiff's substantial connections to the United States."  *Id.* at 576.  Plaintiff failed to establish substantial connections with the United States solely through his "agreement and subsequent relationship with United States intelligence operatives" to provide covert action.  *Id* at 582.  The court in *Doe* concluded a plaintiff must be able to show "connections to the United States independent of [plaintiff's] claim… [o]therwise, the test would be 'eviscerated' because 'all alien plaintiffs asserting a takings claim would necessarily meet it.'"  *Id.* at 575 (internal citations omitted)*; see also Al-Qaisi v. United States*, 103 Fed. Cl. 439, 444 n.5 (2012) (citing *Doe* as "instructive" of when a foreign national in a foreign country demonstrates "significant connections" with the United States sufficient to have standing to sue, as the plaintiff in *Doe* "was recruited by the United States to help during the war in Iraq, attended meetings with many different officers and embassy officials, and generally held 'extensive voluntary contacts' with the United States.")

More recently, in *Kuwait Pearls*, the Court of Federal Claims applied the Federal Circuit's "substantial connections" test as articulated in *Atamirzayeva* to rule a foreign corporation sufficiently pleaded substantial connections with the United States to establish standing to assert a claim under the Fifth Amendment.  *Kuwait Pearls Catering Co., WLL v. United States*, 145 Fed. Cl. 357, 365–67 (2019).  The plaintiff in *Kuwait Pearls*, a subcontractor who provided dining services to the United States military in Iraq, brought a takings claim when the government "physically exclude[ed] [plaintiff] from a temporary dining facility . . . its predecessor built and [plaintiff] operated" and "prevent[ed] [plaintiff's] continued performance under its subcontract."  *Id.* at 360.  The government argued the *Kuwait Pearls* plaintiff lacked

standing to bring a taking claim "because it has not alleged the required substantial connections with the United States." *Id.* at 366.  Rejecting the government's argument the plaintiff had not demonstrated adequate "substantial connections," the court in *Kuwait Pearls* noted the plaintiff "established its voluntary business connections with the Army and direct involvement serving the United States military."  *Id.*  In addition, the court noted the government "relied heavily" on plaintiff "to feed United States troops in both Iraqi wars" and plaintiff's "long history with the United States Government and is in direct privity of contract with the United States Government on various other contracts."  *Id.* at 367.  "Based on the record as a whole," this court concluded plaintiff established substantial connections with the United States "sufficient to assert a claim for compensation under the Takings Clause."  *Id.*

### B.  The Statute of Limitations under 28 U.S.C. § 2501

28 U.S.C. § 2501 creates a six-year statute of limitations for civil actions against the United States, measured from "the time a right of action first accrues."  *FloorPro, Inc. v. United States*, 680 F.3d 1377, 1380 (Fed. Cir. 2012).  "In general, a cause of action against the government accrues 'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.'"  *Id.* at 1381 (citing *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006)).  Whether "the pertinent events" necessary to fix liability against the government and begin the statute of limitations period is an objective standard; "a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue."  *Fallini v. United States,* 56 F.3d 1378, 1380 (Fed. Cir. 1995).  The statute of limitations begins to run once "all events necessary to fix the alleged liability of the government . . . ha[ve] occurred," regardless of the knowledge of one or both of the parties. *FloorPro*, 680 F.3d at 1381.  Claims brought under the Fifth Amendment are limited by the six-year statute of limitations, and "a claim alleging a Fifth Amendment taking accrues when the act that constitutes the taking occurs."  *Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009)*; see also Steel Imp. & Forge Co. v. United States*, 174 Ct. Cl. 24, 29–30 (1966) ("It is axiomatic that a cause of action for an unconstitutional taking accrues at the time the taking occurs.").  The statute of limitations under 28 U.S.C. § 2501 is jurisdictional and thus not subject to equitable tolling principles.  *FloorPro*, 680 F.3d at at 1382.

### i.  When the Statute of Limitations on a Fifth Amendment Takings Claim Begins to Run

A Fifth Amendment taking generally occurs when the government deprives an owner of the use and enjoyment of his or her property.  *United States v. Causby*, 328 U.S. 256, 261–62 (1946); *see also Pete v. United States*, 531 F.2d 1018, 1031 (Ct. Cl. 1976) ("Property is legally taken when the taking directly interferes with or substantially disturbs the owner's use and enjoyment of the property.")  In determining when a cause of action for the taking of personal property by the government first accrues, "neither actual physical control or custody by the Government. . . nor the absence of such factors. . . is necessarily conclusive."  *Cuban Truck & Equipment Co. v. United States*, 166 Ct. Cl. 381, 388 (1964).  The "guiding questions" a court must consider are:  (1) whether the Government "acquired effective control over the property which it seeks to utilize for a public purpose"; and (2) if the government has acquired effective control, "when the extent of the taking, or the kind and quantity of the property appropriated, [is]

determined and determinable." *Id*. at 388–89.  In *Cuban Truck & Equipment Co*., the Federal Circuit determined the point at which the government had acquired effective control over the property at issue as the date "there were no further steps which would have given the [government] greater control over the trucks than it had." *Id.* at 390.  At that point, "plaintiff could immediately have brought suit" for the value of the property taken.  *Id*. at 391.  When the government makes a declaration of the taking of public property on a date after actually taking control of the property, the Supreme Court has made clear the date the statute of limitations begins to run is "the [earlier] date on which the Government entered and appropriated the property to public use" rather than the date of the later public statement.  *United States v. Dow*, 357 U.S. 17, 23 (1958).

To calculate when the statute of limitations starts to run, courts look at the date the government first "interferes with a plaintiff's property rights." *Katzin v. United States*, 120 Fed. Cl. 199, 214 (2015).  "To rise to the level of a taking, . . . such interference [with plaintiff's property rights] must be 'so complete as to deprive the owner of all or most of his interest in the subject matter.'" *Nat'l Food & Beverage Co., Inc. v. United States*, 105 Fed. Cl. 679, 695 (2012) (quoting *R.J. Widen Co. v. United States*, 357 F.2d 988, 993 (Ct. Cl. 1966)).  Notices or threats of a potential taking "by themselves do not suffice" to trigger the statute of limitations, and a takings claim "does not accrue based on the United States' 'mere assertion of title.'" *Katzin*, 120 Fed. Cl. at 214 (quoting *Cent. Pines Land Co. v. United States*, 107 Fed. Cl. 310, 325 (2010))*; see also Etchegoinberry v. United States*, 114 Fed. Cl. 437, 475 (2013) ("For a physical taking, the act that causes the taking also causes the accrual of a takings claim.").  Similarly, this court has previously ruled a "temporary imposition" may not be enough to "deprive [plaintiff] of all or even most of its interest in the property." *Nat'l Food & Beverage Co., Inc.*, 105 Fed. Cl. at 696. For example, the court in *Katzin* ruled "public documents and meetings from the 1980s" and the "placement of signs" which expressed federal ownership of the plaintiffs' land are not sufficient to "constitute an evident interference with [the plaintiffs'] property rights." *Katzin*, 120 Fed. Cl. at 214.  Instead, the question is whether the government "[does] anything that interfered with the [plaintiffs'] use, enjoyment, and marketability of the subject property." *Id*. at 215.  The court in *Katzin* found the first instance of actual interference with the use and enjoyment of the plaintiffs' property did not occur until the government's claim on the property resulted in prospective purchasers refusing to proceed with the sale.  *Id*.  At such a point, the government's action "rendered the subject property inalienable as a practical matter." *Id*.

### ii.  The Accrual Suspension Rule

Under the "accrual suspension rule," the accrual of a claim against the United States "will in some situations be suspended when an accrual date has been ascertained, but the plaintiff does not know of the claim." *Ingrum*, 560 F.3d at 1314.  In such an instance, the accrual will be suspended "until the claimant knew or should have known that the claim existed." *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc).  The accrual suspension rule derives from the use of the term "accrues" in § 2501 and is therefore a matter of statutory interpretation rather than of equitable tolling.  *Id*.  A plaintiff's ignorance or "excusable neglect" of the existence of a claim against the government "is not enough to suspend the accrual of a claim." *Id*. at 1318.  Instead, the accrual date of a cause of action will be suspended in only two circumstances: (1) the plaintiff can show the "defendant has concealed its acts with the result that

plaintiff was unaware of their existence"; or (2) the plaintiff's injury was "inherently unknowable" at the time the cause of action accrued. *Id*. at 1319. A government action cannot be said to constitute an "inherently unknowable activity" if it is an "open and notorious activity" sufficient to put the plaintiff on notice of a possible injury to its property rights. *Ingrum*, 560 F.3d at 1315. A landowner "will be deemed to be on inquiry of activities that are openly conducted on his property," even if the landowner doesn't visit the property or have actual knowledge of the events. *Id*. at 1316. The Federal Circuit has described the "inherently unknowable" standard as a "strict standard" which does not apply whenever the government's actions related to the plaintiff's property are open and notorious. *Id*. at 1317; *see also Martinez*, 333 F.3d at 1303 (stating a claim accrues under § 2501 "when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.'") (quoting *Nager Elec. Co. v. United States*, 177 Ct. Cl. 234, 240 (1966)).

In applying the "inherently unknowable" circumstance of the accrual suspension rule, the Court of Federal Claims has stated "that a claim is 'inherently unknowable' when there is nothing to alert one to the wrong at the time it occurs." *Petro-Hunt, L.L.C. v. United States*, 90 Fed. Cl. 51, 61 (2009)*; see also Tex. Nat. Bank v. United States*, 86 Fed. Cl. 403, 414 (2009) ("The phrase 'inherently unknowable' has been construed to mean that the factual basis for the claim is 'incapable of detection by the wronged party through the exercise of reasonable diligence.'") (quoting *Ramirez-Carlo v. United States*, 496 F.3d 41, 47 (1st Cir. 2007)). The rule will not apply where "all the relevant facts were known" but "the meaning of the law was misunderstood." *Catawba Indian Tribe of S.C. v. United States*, 982 F.2d 1564, 1572 (Fed. Cir. 1993) (emphasis omitted). It is also "not necessary that the plaintiff obtain a complete understanding of all the facts before the tolling ceases and the statute begins to run." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988). A plaintiff must instead make "reasonable inquiry" into the facts underlying the taking claim, "exercise diligence," and "take reasonable steps to look into" any facts which would put the plaintiff on notice of the taking. *Tex. Nat. Bank*, 86 Fed. Cl. at 414.

## IV.  Parties Arguments

In support of its motion to dismiss pursuant to RCFC 12(b)(1), the government argues plaintiff filed its complaint more than six years after the alleged taking occurred and therefore this Court lacks jurisdiction to hear the claims under 28 U.S.C. § 2501. *See* Mot. to Dismiss at 9. Plaintiff filed its complaint in November 2019, and the government claims the complaint alleges government interference with plaintiff's property rights sufficient to constitute a taking "in July 2013, more than six years before [plaintiff] filed this lawsuit." *Id*. According to the government, by July 2013 "[t]here were no further steps that would have given the Government greater control over [plaintiff's] property than it had at that time." *Id*. As an alternative ground for its motion to dismiss, the government argues the property is outside U.S. territory and plaintiff, as a "foreign company seeking compensation for the taking of foreign property," did not plead the necessary substantial connections with the United States to establish standing to sue for an alleged violation of the Fifth Amendment. Mot. to Dismiss at 6.

In response, plaintiff argues the Court has jurisdiction to hear its claims. It asserts the statute of limitations did not begin to run until December 2013 at the earliest, either because the

claim did not accrue or because plaintiff was unaware of a potential claim against the government for the taking of its property. Pl.'s Resp. at 6–7. In support of this position, plaintiff points to various statements made by government employees throughout the summer and fall of 2013, which it claims "delayed or suspended" the accrual of the takings claim for statute of limitations purposes. *Id*. at 5–11. Plaintiff also argues its relationship with the United States through a subcontract for the development of a project built on behalf of the USACE and subject to USACE oversight and restrictions creates sufficient connections to the United States to give it standing to bring a claim under the Fifth Amendment. *Id*. at 11–13.

## V.    Plaintiff's Supplemental Paper

During oral argument, the Court raised a factual question regarding whether plaintiff had "any other connectivity with the United States in the past . . . other than the project of work that is described. . . in the complaint." Transcript ("Tr."), ECF No. 25 at 24:5–9. The parties did not discuss this question in their briefing prior to oral argument. *See generally* Am. Compl.; Mot. to Dismiss; Pl.'s Resp. As suggested by the government, these facts—addressing whether plaintiff has connections with the United States separate from the facts underlying the alleged taking—are imperative to whether plaintiff has substantial connections with the United States, because plaintiff must show connections to the United States that are independent of the claim at issue. *Id.* at 19:7–25. Plaintiff's counsel was not prepared to provide such information at oral argument. *Id*. at 25:7–12.

Following oral argument, plaintiff moved for the Court's leave to file a supplemental paper answering the Court's question regarding whether plaintiff had previous connections with the United States before the present subconstruct. *See* Pl.'s Mot. for Leave and *infra* discussion in FN 7. Plaintiff proposes to supplement the record with "15 additional U.S. Government-funded projects in which Plaintiff participated as a prime contractor or subcontractor." *Id.* at 1. Plaintiff indicates the supplemental information "is provided as a direct response to a factual question posed by the Court and raised by the Government's attempted distinction of a case relied upon by Plaintiff." *Id.* The government objects to plaintiff's proposed supplemental paper, arguing it is untimely and does not aid the Court's analysis. Def.'s Resp. to Pls.'s Mot. for Leave at 1. The government does not cite any law to support plaintiff's supplemental paper being stricken as untimely but simply argues plaintiff "had ample opportunity to present argument and information to the Court relating to its standing and should not now be permitted to further delay resolution of the Government's motion." *Id.* at 3. The government further argues plaintiff's supplemental paper does not aid the Court's analysis because the supplemental information reflects plaintiff's reliance on *Kuwait Pearls*, a case the government notes "is not controlling authority in this case" and which the government believes "cannot serve as a basis for establishing standing because it was wrongly decided" or, at least, is "factually distinguishable." *Id.* at 3. The government does not contend it is prejudiced by allowing plaintiff's supplemental paper or point to any law forbidding plaintiff from supplementing the record at this stage of litigation. *See generally id*.

The question whether plaintiff had prior connections with the United States independent of plaintiff's claim was first raised *sua sponte* by the Court during oral argument when discussing *Doe v. United States* with the government. Tr. at 19:7–13; *see also Doe v. United*

*States*, 95 Fed. Cl. 546, 575 (2010) ("Plaintiff must show connections to the United States independent of his claim. The text of the Supreme Court's opinion in *Verdugo–Urquidez* supports this ruling."). The government cited *Doe* in its motion to dismiss but did not raise the issue that *Doe* requires "plaintiff must show connections to the United States that are independent of his claim." *See* Mot. to Dismiss at 11, 12, 15.[4] Contrary to the government's allegation plaintiff could have provided the information to the Court earlier, it was not until oral argument that plaintiff was first put on notice its prior connections to the United States could be a relevant issue.

The government's second argument is plaintiff is merely rehashing arguments based on *Kuwait Pearls* and therefore plaintiff's supplementary information does not aid the Court's analysis. Def.'s Resp. to Pls.'s Mot. for Leave at 3. Plaintiff submitted the paper to specifically answer the Court's question, which was prompted by a discussion between the Court and the government on *Doe v. United States*. *See* Tr. at 24:5–9, 19:7–25. The Court does not find such information duplicative because the record prior to the supplemental paper was missing plaintiff's connections with the United States *before* the SI HAH contract. Without reaching the merits of whether plaintiff's reliance on *Kuwait Pearls* is legally sound, the Court disagrees with the government's argument plaintiff's supplemental paper does not aid the Court's analysis. Rather, plaintiff's supplemental paper reflects information similar to what was considered by the *Kuwait Pearls* court in concluding substantial connections existed. *See Kuwait Pearls Catering Co., WLL v. United States*, 145 Fed. Cl. 357, 365–67 (2019). Indeed, the parties' arguments based on *Kuwait Pearls,* though not determinative, substantively aid the Court's analysis of whether plaintiff has substantial connections with the United States. *See infra.* Accordingly, the Court grants plaintiff's motion for leave to file its supplemental paper and thereby considers the information in plaintiff's proposed supplemental paper. *See e.g. King v. United States,* No. 18-1115C, ECF No. 67 (Fed. Cl. Aug. 31, 2020) (granting a similar motion on the ground of good cause shown and finding no prejudice to the non-moving party); *System Fuels, Inc. v. United States*, No. 03-2623C, ECF No. 54 (Fed. Cl. Jan. 28, 2005) (same); *see also infra* discussion in FN 7.

## VI.   Plaintiff's Substantial Connections with the United States

The Supreme Court has consistently rejected "the view that every constitutional provision applies wherever the United States Government exercises power." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 268 (1990). Indeed, "[t]he Supreme Court has long taken the view that the Constitution is subject to territorial limitations." *Atamirzayeva v. United States*, 524 F.3d 1320, 1322 (Fed. Cir. 2008); *see also Verdugo-Urquidez*, 494 U.S. at 269. Referencing *Verdugo-Urquidez*, the Federal Circuit in *Atamirzayeva* upheld the trial court's reliance on the "substantial connection test" to determine whether plaintiff had a right to relief under the Fifth Amendment. *Atamirzayeva*, 524 F.3d at 1325-26. The Federal Circuit held there is no "blanket

---

[4] In its motion to dismiss, the government cited *Doe v. United States* to argue plaintiff failed to plead a substantial connection with the United States to bring a takings claim under the Fifth Amendment, because plaintiff "[does not] allege[] that it had a direct contractual relationship with the United States, nor does it allege that the Afghan National Army Regional Military Training Center was considered to be American territory or property (and it was not)." *See* Mot. to Dismiss at 11, 12, 15 (citing *Doe v. United States*, 95 Fed. Cl. 546, 569, 575).

rule that the Fifth Amendment protects the foreign property of citizens of every foreign country without regard to their connections with the United States." *Id.* at 1328.

The government contends the Court should dismiss plaintiff's takings claim because, "as a foreign company alleging the taking of property in a foreign country," plaintiff "fail[s] to allege the substantial connection with the United States necessary to invoke the Fifth Amendment's Takings Clause." Mot. to Dismiss at 11. Plaintiff does not dispute it is "a foreign subcontractor providing services" to the United States in Afghanistan. Pl.'s Resp. at 12. Plaintiff argues instead it has sufficiently pled a substantial connection with the United States by showing it was "directly involved with the USACE personnel regarding the contract through weekly meetings and . . . was subject to U.S. Government's control, authority, supervision and requirements." *Id.* at 12–13. The government agrees with plaintiff's factual summary on the "control, authority, and supervision" that the United States had over plaintiff. Tr. at 29:3–10. The government, however, insists plaintiff's contractual connections with the Afghanistan government, and plaintiff's subcontract with the United States, as being governed by Afghanistan law, does not confer standing to plaintiff in this Court. *Id.* at 29:24–30:18. According to the government, plaintiff does not have a substantial connection with the United States because plaintiff (1) has no alleged previous voluntary connections with the United States and (2) has no alleged direct relationship with United States in this case. *Id.* at 6:3–9.

### A. Plaintiff's Connection with the United States in the Project Giving Rise to Plaintiff's Claim

The government argues *Atamirzayeva* and *Kuwait Pearls* both require "a direct relationship with the United States" to establish a substantial connection. Tr. 6:14–25 (citing *Atamirzayeva*, 524 F.3d 1320 (Fed. Cir. 2008), *Kuwait Pearls Catering Co., WLL v. United States,* 145 Fed. Cl. 357 (2019)). In particular, the government explains "direct contacts that the Court in *Kuwait Pearls* found [are] . . . the United States . . . had direct management of the plaintiff's performance of its contract, such that it restricted the plaintiff's autonomy to perform its services. The United States [in *Kuwait Pearls*] had 'complete control' over . . . a number of the plaintiff's services." Tr. at 16:9–15. The government argues the connections plaintiff pled in the complaint, including "[plaintiff's] subcontract with HLH, . . . the fact that the USACE had overall supervision of the construction project[,] and that payment originated from USACE," fail to prove "[plaintiff] provided any services directly to the United States" and therefore fail to establish plaintiff has sufficient substantial connections with the United States. Mot. to Dismiss at 14.

In *Atamirzayeva*, the Federal Circuit found plaintiff had no substantial connection with the United States because she "ha[d] not pleaded any relationship, business or otherwise, with the United States," and her only connections with the United States were "that her cafeteria was adjacent to the U.S. Embassy and that embassy officials directed the seizure." *Atamirzayeva*, 524 F.3d at 1328. The *Atamirzayeva* court upheld the application of the "substantial connection test" to determine a foreign plaintiff's right to relief under the Fifth Amendment, and, by interpreting *Turney*, provides certain examples of possible "substantial connections" with the United States. *Id.* at 1326, 1328. The Federal Circuit did not set out the examples in *Turney* as a set of requirements lower courts must follow to determine what constitutes a "substantial

connection," but rather instructed each analysis of whether substantial connections exist must depend on whether plaintiff has a right to seek just compensation "under the facts of that case." *Id.* at 1328.

The government argues *Atamirzayeva* mandates "a direct relationship with the United States" to establish substantial connections. Tr. 6:14–25. *Atamirzayeva* does not require "a direct relationship with the United States," or provide any other rigid requirement for specific type of relationship, to establish a substantial connection between plaintiff and the United States. *See Atamirzayeva*, 524 F.3d at 1327–29. Instead of drawing a hasty conclusion based on a single dispositive factor, the Court examines the totality of "the facts of [this] case" to decide whether plaintiff has a right to seek just compensation. *Id.*

As suggested by both parties, the facts of this case are most similar to the facts of *Kuwait Pearl*, the first case from this court finding a foreign subcontractor has standing to sue the United States in a Fifth Amendment takings case. Indeed, the government cannot identify a case finding a subcontractor on a project to benefit the United States does not have standing to sue under the substantial connections test. Tr. at 17:12–19 (When asked by the Court if the government "can point to [any example case] where a plaintiff who was a genuine subcontractor with the United States could not establish standing,'" counsel for the government answered he was not aware of one "in the context of a foreign subcontractor bringing a Fifth Amendment takings claim."). The *Kuwait Pearls* court analyzed and distinguished *Atamirzayeva* from the facts before it, noting, unlike "the plaintiff in *Atamirzayeva* [who] had failed to plead 'any relationship, business or otherwise, with the United States,'" the plaintiff in *Kuwait Pearls* "has established its voluntary business connections" with the United States military. 145 Fed. Cl. at 366 (emphasis omitted). The court in *Kuwait Pearls* found sufficient voluntary business connections with the United States by considering the following facts: plaintiff provided dinning services directly to the United States military on a United States base under a subcontract; a government official approved the subcontract; and plaintiff's services were funded through the primary contact with the United States. *Id*. at 366–367.

Plaintiff's alleged injury in this case stems from a construction project in Afghanistan, in which plaintiff was an approved subcontractor for the USACE. Am. Compl. at ¶ 5–9. Plaintiff's employees and representatives "attended and participated in the weekly meetings with USACE personnel regarding the project." Zaland Declaration at 1. Plaintiff's job site was subject to the control of the U.S. Army and USACE, and the United States restricted access to the job site only to authorized individuals. *Id*. Plaintiff's work was also subject to "inspection, testing and, ultimately, acceptance by the United States and the health and sanitary requirements of the USACE." Am. Compl. at ¶ 9. Plaintiff's payments were subject to retainage to be determined and invoked by the United States government. Tr. at 10:4–6. The *Kuwait Pearls* court relied on similar facts to find the existence of a substantial connection between plaintiff and the United States. *See Kuwait Pearls,* 145 Fed. Cl. at 366–367. Based on the factual similarities between *Kuwait Pearls* and this case, and the fact the court in *Kuwait Pearls* found sufficient substantial connections existed to establish standing, the Court finds *Kuwait Pearls* does not support the government's argument plaintiff does not have a substantial connection with the United States due to a lack of a direct relationship with the government.

**B.  Plaintiff's Connections with the United States Separate from the Project Giving Rise to Plaintiff's Claim**

The government argues plaintiff must have "previous voluntary connections" and "direct relationship" with the United States to establish substantial connections. Tr. at 6:6–9.  In particular, the government contends plaintiff's connection with the United States cannot "solely be the injury . . . [or] the conduct that gives rise to the claim." Tr. at 20:5–9.  Instead, plaintiff must have "an overarching relationship, . . . work unrelated to the claim and communications unrelated to the claim" with the United States. Tr. at 21:4–6.  In advocating for this approach, the government urges the Court to consider whether the plaintiff had "a long history with the United States [g]overnment" and was "in direct privity of contract with the United States [g]overnment on various other contracts" or was "a preferred vendor of the United States [m]ilitary." Tr. at 16:16–21; *see also* Mot. to Dismiss at 14–15.

The government's "previous voluntary connections" argument is rooted in the Supreme Court's *Verdugo-Urquidez* decision, Tr. at 7:5–14, where the Court found Verdugo-Urquidez, a citizen and resident of Mexico, "had no previous significant voluntary connection [prior to his extradition] with the United States," and as such, lacked substantial connections sufficient to claim Fourth Amendment protections. *Verdugo-Urquidez*, 494 U.S. 259 at 271.  The *Kuwait Pearls* court applied *Verdugo-Urquidez* in the context of a foreign subcontractor working for the United States abroad.  *Kuwait Pearls*, 145 Fed. Cl. at 360, 367.  In *Kuwait Pearls*, the fact "[plaintiff] has a long history with the United States [g]overnment and is in direct privity of contract with the United States [g]overnment on various other contracts" supported the court's finding plaintiff had adequate substantial connections with the United States.  *Id.* at 367.

This court further applied *Verdugo-Urquidez* to analyze if a foreign national can bring a takings claim for property located abroad in *Doe v. United States*.  95 Fed. Cl. 546, 575 (2010).  In *Doe,* plaintiff was an Iraqi citizen claiming the Coalition Forces occupied his property without fair compensation during the United States' military actions in Operation Iraqi Freedom.  *Id.* at 551–52.  The court in *Doe* found all of the plaintiff's alleged connections with the United States were related to the incident giving rise to plaintiff's claims, and therefore held:  "[T]he circumstances that underlie plaintiff's takings claim do not satisfy the *Verdugo–Urquidez* substantial connections test. Otherwise, the test would be eviscerated because all alien plaintiffs asserting a takings claim would necessarily meet it."  *Id.* at 575 (citation omitted).

In this case, plaintiff entered into a 2011 agreement to serve as a subcontractor for a SI-HAH contract with the USACE, an agreement which ultimately led to plaintiff's claim.  Am. Compl. at ¶ 7.  Beginning at least seven years prior to the SI-HAH work, and ranging from 2004 to 2011, plaintiff maintained a long-term business relationship with the United States government.  *See generally* Pl.'s Supp. Paper.  Between 2004 and 2006, plaintiff completed four USAID-funded construction projects as a subcontractor.  *Id.* at 2.  Starting in 2007, plaintiff worked directly with the United States as a primary contractor for a wide range of projects.  For each project plaintiff worked as the primary contractor detailed in the record, plaintiff received a letter of recommendation or a memorandum of appreciation from the United States government recognizing plaintiff's contribution and quality of work.  *See e.g.* Supp. Paper Ex. at Ex. E, Ex. F.  In a letter of recommendation from the DOD dated 7 October 2007, the officer wrote

"[plaintiff] is highly recommended for future CMO / CERP funded projects sponsored by Coalition Forces." Supp. Paper Ex. at Ex. F. Additionally, in a letter of recommendation from the DOD dated 1 February 2009, a United States military officer wrote "[plaintiff] has maintained a business relationship with Coalition Forces in Afghanistan for many years" and "[plaintiff's] work . . . have been some of the best work I have seen throughout almost two years spent in Afghanistan." Supp. Paper Ex. at Ex. I.

At least between 2007 and 2011, plaintiff was in direct privity of contract with the United States government on various contracts. *See supra*. As demonstrated by the letters and memorandums plaintiff received, plaintiff was a preferred vendor of the United States for construction projects in Afghanistan. Unlike *Atamirzayeva* where plaintiff's only connection with the United States was her cafeteria allegedly being seized at the United States embassy's direction, 524 F.3d at 1328, the record shows plaintiff has "previous significant voluntary connection [prior to the current dispute] with the United States." *Verdugo-Urquidez*, 494 U.S. at 271 (1990). In other words, this case is dissimilar from the situation in *Atamirzayeva* where the United States allegedly came out of blue and took plaintiff's property. *Atamirzayeva*, 524 F.3d at 1329. Instead, as in *Kuwait Pearls*, these facts—showing "[plaintiff] has a long history with the United States [g]overnment and is in direct privity of contract with the United States [g]overnment on various other contracts"—support a finding that plaintiff has substantial connections with the United States. *Kuwait Pearls*, 145 Fed. Cl. at 367. Plaintiff has alleged sufficient facts to show its connections with the United States exist beyond only the USACE subcontract giving rise to plaintiff's claims. Plaintiff's relationship with the United States satisfies the *Verdugo–Urquidez* substantial connections test, as plaintiff had "previous significant voluntary connection [prior to the alleged takings] with the United States." *Verdugo-Urquidez*, 494 U.S. at 271.

## C. The United States Community

The government further argues, for a foreign citizen to receive constitutional protection, the substantial connection test in *Verdugo-Urquidez* requires plaintiff to have "sufficient connections with the United States to be considered part of the community." Tr. at 14:19–20. Plaintiff agrees with the government's characterization of *Verdugo-Urquidez* as imposing such a "community" requirement and contends plaintiff is part of the U.S. community by willingly "going into a U.S.-funded project in Afghanistan" and "putting [itself] at the U.S. government's whim." Tr. at 33:20–23, 32:23–25. Between 2004 and 2011, plaintiff worked for the Army to reconstruct and repair various local infrastructures damaged during the war. *See generally* Pl.'s Supp. Paper. For example, in 2007, plaintiff helped the Army to restore a high school in the Jaji District of Afghanistan after it was damaged by fire from the Pakistani military. *Id.* at 3. In 2009, plaintiff worked on clearing snow and ice for the Army from Tera Pass in the Logar Province of Afghanistan. *Id.* at 4. The Army described plaintiff' work as "unparalled thus far" because it "resulted in zero casualties due to road conditions in the Tera Pass this year, down from 18 the year before." Supp. Paper Ex. at Ex. I. Plaintiff noted at oral argument local companies working in Afghanistan "at the behest and with the funding of the U.S. Government" were "choosing a side and . . . putting your company and yourself and your family at risk from people who didn't want the U.S. there." Tr. at 33:16–25. Plaintiff also points to the special preference for U.S. visas Afghan subcontractors receive as a result of the U.S. government

recognizing their "work at the behest and with the funding of the U.S. [g]overnment" and thus including them into the U.S. community.  Tr. at 33:20–34:3.

In *Verdugo-Urquidez*, the Supreme Court stated "'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."  *Verdugo-Urquidez*, 494 U.S. at 265 (citing *United States ex rel. Turner v. Williams,* 194 U.S. 279, 292 (1904)).  While the majority contrasted the language of these Amendments with "the words 'person' and 'accused' used in the Fifth and Sixth Amendments regulating procedure in criminal cases," Justice Kennedy emphasized the importance of the distinction between constitutional claims raised by citizens and those raised by "noncitizens who are beyond our territory."  *Id.* at 276 (Kennedy, concurring).  The Federal Circuit applied *Verdugo-Urquidez* to Fifth Amendment takings claims brought by a foreign citizen for oversea properties and upheld the requirement of the "substantial connection test" in such settings.  *Atamirzayeva*, 524 F.3d at 1325–26.  While the Federal Circuit did not elaborate on the meaning of the term "United States community" in the context of a Fifth Amendment takings claim, it instructed lower courts to consider whether a foreign plaintiff has a right to seek just compensation under the facts of each particular case.  *Id.* at 1328.

As discussed *supra,* the Court finds plaintiff has satisfied the substantial connection test of *Verdugo-Urquidez* and *Atamirzayeva* by demonstrating sufficient facts related to its connections with the United States.  Whether plaintiff can be considered part of the United States community is therefore not a dispositive factor for this issue, particularly when there is no clear precedent defining what it means to be a member of the "United States community" sufficient to give this Court jurisdiction over a Fifth Amendment takings claim brought by a foreign national related to alleged government actions in a foreign country.  Nevertheless, as the parties both advance relevant arguments, the Court makes the following observation.  Plaintiff was involved in at least 15 contracts with the United States between 2004 and 2012, eight of which plaintiff was the primary contactor dealing directly with the government.  Pl.'s Supp. Paper at 1.  Plaintiff has received numerous letters of recommendation and appreciation from the United States government for completing those projects.  For example, one letter issued by the Army on 16 November 2008 recognized plaintiff's work "help[ed] the people of Logar Province improve their quality of life and increase the legitimacy of the Afghan government."  Supp. Paper Ex. at Ex. J.  Another letter from the DOD dated 7 October 2007 stated "[plaintiff] is highly recommended for future CMO / CERP funded projects sponsored by Coalition Forces."  Supp. Paper Ex. at Ex. F.  Additionally, in a letter dated 1 February 2009, a U.S. army officer wrote "[plaintiff] has maintained a business relationship with Coalition Forces in Afghanistan for many years" and "[plaintiff's] work . . . have been some of the best work I have seen throughout almost two years spent in Afghanistan."  Supp. Paper Ex. at Ex. I.  These communications demonstrate the government's recognition of plaintiff's contribution to the government's overseas projects.  As plaintiff's attorney noted during oral argument, "[i]t was part of the overarching policy of the government to foster economic development in Afghanistan and . . . build the country, build its economy, build allies."  Tr. at 33:10–13.  The government indeed acknowledged and appreciated plaintiff's assistance in the government's efforts in Afghanistan.  *See generally* Supp. Paper Ex.  The Court accordingly observes the facts currently in the record

strongly support plaintiff being considered part of the United States community.  *See Verdugo-Urquidez*, 494 U.S. at 265.

### D.  Conclusion on Plaintiff's Substantial Connections with the United States

The Court disagrees with the government's argument plaintiffs must establish substantial connections through a showing of "a direct relationship with the United States," or under any other rigid requirement for certain type of relationship.  Instead of drawing a hasty conclusion based on a single dispositive factor, the Court examines the totality of "the facts of [the] case" to decide whether plaintiff has a right to seek just compensation.  *See Atamirzayeva*, 524 F.3d at 1328.  Here, the Court finds plaintiff satisfies the *Verdugo–Urquidez* substantial connection test based on at least the following facts:  (1) plaintiff was an approved subcontractor with frequent interactions with the government during its work on the contract giving rise to plaintiff's claim; (2) plaintiff was in direct privity of contract with the United States on various contracts and was a preferred vendor of the United States for construction projects in Afghanistan, demonstrating plaintiff's connections with the United States went beyond the USACE subcontract that gives rise to plaintiff's claims; and (3) plaintiff was repeatedly recognized and appreciated by the government for plaintiff's contributions to the government's overseas efforts in Afghanistan, which supports plaintiff being considered part of the United States community.  *Verdugo-Urquidez*, 494 U.S. at 265, 271; *see also Kuwait Pearls,* 145 Fed. Cl. at 366–367.  Accordingly, construing the record before the Court in the light most favorable to plaintiff, the Court finds plaintiff has met the burden to overcome the jurisdictional requirement at the motion to dismiss stage, as plaintiff sufficiently pleads substantial connections with the United States to establish a standing to sue the government under the Fifth Amendment's Takings Clause.  *Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993), *N. Hartland, L.L.C. v. United States*, 309 F. App'x 389, 391 (Fed. Cir. 2009), *Atamirzayeva*, 524 F.3d at 1325–26.

## VII.   The Statute of Limitations

Plaintiff filed its initial complaint on 27 November 2019.  *See* Compl.  The government contends plaintiff's claim is barred as untimely because the six-year statute of limitations began to run in July 2013 when the government "open[ly] and notorious[ly]" interfered with plaintiff's property rights.  Mot. to Dismiss at 10.  Plaintiff argues its claim "did not accrue until, at the earliest, in or about December 2013," when plaintiff "observed ANA personnel using what it thought to be some of its generators."  Pl.'s Resp. at 5, 6–7.

### A.  The Government's "Use and Enjoyment" of Plaintiff's Property

A Fifth Amendment taking generally occurs when the government deprives an owner of the use and enjoyment of his or her property.  *United States v. Causby*, 328 U.S. 256, 261–62 (1946).  "'[W]here the actions of the government are open and notorious . . . [the] plaintiff is on inquiry as to its possible injury,' and the statute of limitations begins to run."  *Ingrum v. United States*, 560 F.3d 1311, 1315 (Fed. Cir. 2009) (quoting *Coastal Petroleum Co. v. United States*, 228 Ct. Cl. 864, 867 (1981)).  To determine when a claim first accrues for the purpose of calculating when the statute of limitations started to run, courts look at when the government first

- 20 -

actually "interferes with a plaintiff's property rights." *Katzin v. United States*, 120 Fed. Cl. 199, 214 (2015).

On 25 January 2012, the USACE terminated the contract with SI-HAH, and on the same day, SI-HAH directed plaintiff to stop working on the project and vacate the premises. Am. Compl. at ¶ 11–12. As instructed by SI-HAH, plaintiff did not remove any materials from the construction site. *Id*. at ¶ 12. On 19 July 2013, plaintiff received an email from a representative of the U.S. military informing plaintiff it had until 22 July 2013 to remove its property from the construction site. Zaland Declaration at 21. Nevertheless, when plaintiff thereafter attempted to approach the construction site to remove its property, U.S. government personnel told plaintiff's employees they could not enter the site or remove the equipment and threatened the employees with arrest should they attempt to return. Zaland Declaration at 2.

During oral argument, the government argued, "at that moment [in July 2013 when U.S. government personnel denied plaintiff access to the construction site], the [g]overnment literally had physical possession and control of [plaintiff's] property and is alleged to have clearly interfered with [plaintiff's] property rights." Tr. at 39:16–19. The government also contends its actions in July 2013 were sufficiently "open and notorious" to put plaintiff on inquiry notice of the government's alleged takings, and therefore the six-year statute of limitations began to run July 2013. Mot. to Dismiss at 10. Plaintiff contends, as it was working on the government's controlled-access premises and had voluntarily moved its property to the government's restricted jobsite as early as 2011, "the exercise of physical control and restrictions on access [to plaintiff's property] itself" cannot establish the appropriation in this case; instead, takings happen when "[the government has] determine[d] . . . [it's] not going to leave this property here anymore, [it's] going to go do something else with it, [or] make some other use of it." Tr. at 46:16–47:5. Plaintiff agrees it was deprived of the use and enjoyment of its property earlier than July 2013. Tr. at 49:4–8 (When asked when plaintiff was deprived of the use and enjoyment of its property, plaintiff's counsel answered: "[plaintiff] did not have the use and enjoyment of its property after January of 2012."). Plaintiff contends, however, if the claim accrued by July 2013, the accrual suspension doctrine applies to suspend the accrual date until December 2013. Tr. at 49:13–25.

As both parties agree the government deprived plaintiff of the use and enjoyment of its property since at least July 2013, absent events triggering the suspension of the claim accrual date the six-year statute of limitations period for plaintiff's claim expired July 2019. *See Causby*, 328 U.S. at 261–62.

## B. The Accrual Suspension Rule

Under the "accrual suspension rule," the accrual of a claim against the United States "will in some situations be suspended when an accrual date has been ascertained, but the plaintiff does not know of the claim." *Ingrum*, 560 F.3d at 1314 (citing *Japanese War Notes Claimants Ass'n v. United States,* 178 Ct. Cl. 630, 634 (1967)). The "accrual suspension rule" applies when plaintiff's injury was "inherently unknowable" at the time the cause of action accrued. *Id*. at 1315. Courts have previously defined a claim as "inherently unknowable" "when there is nothing to alert one to the wrong at the time it occurs." *Petro-Hunt, L.L.C. v. United States*, 90 Fed. Cl. 51, 62 (2009); *see also Tex. Nat. Bank v. United States*, 86 Fed. Cl. 403, 414 (2009) ("The phrase 'inherently unknowable' has been construed to mean that the factual basis for the

claim is 'incapable of detection by the wronged party through the exercise of reasonable diligence.'") (quoting *Ramirez-Carlo v. United States*, 496 F.3d 41, 47 (1st Cir. 2007)).  The plaintiff must make "reasonable inquiry" into the facts underlying the taking claim, "exercise diligence," and "take reasonable steps to look into" any facts which would put the plaintiff on notice of the taking.  *Tex. Nat. Bank*, 86 Fed. Cl. at 414.

Plaintiff was informed by a representative of the United States military it had until 22 July 2013 to remove its property, and in fact attempted to retrieve its property on 19 July 2013, but was denied access to the site and threatened with arrest.  Zaland Declaration at 2, 21.  After plaintiff failed to retrieve its equipment in July 2013, it contacted Mr. Peter Hughes, a special agent with the United States Special Inspector General for Afghanistan Reconstruction, for assistance.  *Id.* at 2.  On 4 August 2013, Mr. Hughes communicated with United States military personnel on plaintiff's behalf and requested clarification on the dispute.  *Id.* at 2, 22.  Mr. Hughes later informed plaintiff "he had spoken to Captain Finlay" and "would contact a USACE commander and let [plaintiff] know what to do."  *Id.* at 2.  On 14 September 2013, Captain Finlay notified plaintiff he "had nothing to do with any of [plaintiff's] property being confiscated and that he was not directing anyone to do that."  *Id.*  Plaintiff immediately requested contact information for a USACE representative who could return its equipment, but never obtained the requested information.  *Id.* at 2–3.  In December 2013, plaintiff's CEO observed some ANA personnel using plaintiff's property.  *Id.* at 3.  On 24 December 2013, plaintiff met with USACE personnel and submitted documentation related to the equipment and materials plaintiff sought to recover.  *Id.*  The USACE then informed plaintiff it would receive the property back on 4 January 2014.  *Id.*  Nevertheless, plaintiff did not receive any of the property by 4 January 2014, and when plaintiff again attempted to contact the U.S. government, it was told the government had given plaintiff's properties to the ANA, and plaintiff "should not ask about this matter anymore."  *Id.*[5]

The government originally contended plaintiff's claim accrued in July 2013 when plaintiff should have been on "inquiry notice" of the government's interference of plaintiff's property right.  Mot. to Dismiss at 10.  During oral argument, the government explained the July 2013 accrual date was deduced from the allegations on the complaint.  Tr. at 54:6–11.  The government argued in the alternative the July 2013 date did not consider the email exchange between plaintiff and U.S. government personnel—Mr. Hughes and Captain Finlay—during fall 2013, and the government argued for an accrual date of September 2013 after it accounted for the communications.  *See* Tr. at 65:17–19 ("But even . . . taking a generous read of these emails, by September, [p]laintiff was on inquiry notice.").  In particular, the government cites Captain Finlay's response to plaintiff on 14 September 2013—"I have nothing to do with any of your property being confiscated.  I am not directing anyone to do it and I don't know who is taking your property"—to support the argument plaintiff was on inquiry notice that "it had a claim or a potential claim" against the government.  Tr. at 65:23–66:4, 66:13–15, 67:15–18 ("Captain Finlay's response, if you take at the face value, . . . it puts . . . [plaintiff] on inquiry notice that it has a potential claim.").  Additionally, the government views plaintiff's 4 August 2013 email, in which plaintiff asked Mr. Hughes "[y]ou may please find a legal track for me that I could get my

---

[5] The Court is not able to discern from the record the exact date when the government told plaintiff it "should not ask about this matter anymore."  *See* Zaland Declaration at 3.

rights or if there is any other department or agency whom are in high position that I should register my claim for my rights," as plaintiff was "conducting an inquiry" into its claim.  Tr. at 72:17–22, 73:5–13.

The government characterizes the communications between plaintiff and USACE personnel in December 2013 and January 2014 as "immaterial considering everything that happened leading up to it" and therefore inadequate to continue to suspend the accrual of plaintiff's claims.  Tr. 68:2–3.  The government contends, because none of the its statements during the fall of 2013 "assur[ed] the [p]laintiff that it would get its property back," the December 2013 and January 2014 communications are "after the fact" of plaintiff already having inquiry notice.  Tr. at 71:4–16.

If a plaintiff is on inquiry of a possible injury, the accrual suspension rule does not apply and the statute of limitations begins to run.  *Ingrum*, 560 F.3d at 1314 (quoting *Coastal Petroleum Co. v. United States*, 228 Ct. Cl. at 867) ("The line of 'accrual suspension' cases dealing with takings claims has established that '[w]here the actions of the government are open and notorious ... [the] plaintiff is on inquiry as to its possible injury,' and the statute of limitations begins to run.").  Here, the question is whether plaintiff was, or should have been, on inquiry notice of the government having deprived plaintiff of its property right by at least September 2013.  *Id.*

In early August 2013, Mr. Hughes informed plaintiff "he had spoken to Captain Finlay" and "would contact a USACE commander and let [plaintiff] know what to do."  Zaland Declaration at 2.  Throughout August and September 2013, plaintiff was making continuous efforts to retrieve its property from the government by communicating with Mr. Hughes and Captain Finlay.  *Id.* at 18 (plaintiff's email to Mr. Hughes on 22 August 2013 stating "you had promised me that you will solve this matter for me but still its [sic] pending), *id.* (Captain Finlay's email to Mr. Hughes on 14 September 2013 stating "[plaintiff] just gave me a phone call concerning some of his property that he is still trying to track down"), *id.* at 17–18 (plaintiff's email to Captian Finlay on 14 September 2013 stating government personnel are preventing plaintiff from removing its property and "have the intention to confiscate" the property, while also asking Captain Finlay if there is a designated person with whom plaintiff may "contact . . . for negotiation.").  On 14 September 2013, Captain Finlay replied to plaintiff saying he was not directing anyone to confiscate plaintiff's property, and he did not know who was taking it.  *See id.* at 17.  Plaintiff immediately replied by asking Captain Finlay for the correct USACE personnel it should contact to recover its property, but Captain Finlay did not appear to respond.  *Id.*  The record currently before the Court shows plaintiff's conversations with government personnel paused until December 2013, when plaintiff met with the USACE to submit documentation regarding plaintiff's missing equipment.  *Id.* at 3.  USACE then assured plaintiff USACE would return the equipment on 4 January 2014.  *Id.*

When deciding a motion to dismiss, the Court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016) (citing *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011)).  The August and September communications in the record demonstrate plaintiff believed the government had not yet seized

its property, with plaintiff describing the matter as "pending" and seeking to "negotiate" with the right government personnel to retrieve its property. Zaland Declaration at 17–18. The government's representatives, Captain Finlay and Mr. Hughes, spoke as if they were investigating plaintiff's request and never definitively told plaintiff it would not get the property back. *Id.* Captain Finlay's 14 September 2013 statement, which the government relied on at oral argument to show plaintiff was on inquiry notice about its claim by at least September 2013, shows Captain Finlay did not know what happened to plaintiff's property and did not direct anyone to confiscate plaintiff's property. Zaland Declaration at 17. Similarly, plaintiff's August 2013 email seeking to enforce its "rights" in the property, also relied on by the government to show inquiry notice, merely reflects plaintiff's efforts to retrieve its property from the government-controlled site. *See* Zaland Declaration at 20 (Plaintiff emailed Mr. Hughes: "You may please find a legal track for me that I could get my rights or if there is any other departments or agency whom are in high position that I should register my claim for my rights."). Drawing all reasonable inferences in plaintiff's favor, the Court agrees with plaintiff that the government's actions in August and September 2013 were not enough to put plaintiff on notice of the accrual of a takings claim. *See Acevedo*, 824 F.3d at 1368. The government's actions were not sufficiently "open and notorious" to put plaintiff on inquiry of a possible injury until December 2013 at the earliest, when plaintiff observed ANA personnel using its property. *Ingrum*, 560 F.3d at 1314 (quoting *Coastal Petroleum*, 228 Ct. Cl. at 867 (1981)) ("[W]here the actions of the government are open and notorious . . . plaintiff is on inquiry as to its possible injury . . . .") (internal quotation marks omitted).

Plaintiff argues the "accrual suspension rule" suspends the accrual date of plaintiff's claim until December 2013 because, "[e]ven if the government had exercised dominion and control over [p]laintiff's property and repurposed it to some other use prior to December 2013," the permanent nature of the government's action was inherently unknowable by plaintiff. Pl.'s Resp. at 10–11. In applying the "inherently unknowable" circumstance of the accrual suspension rule, this court has previously found "a claim is 'inherently unknowable' when there is nothing to alert one to the wrong at the time it occurs." *Petro-Hunt, L.L.C.*, 90 Fed. Cl. at 61. A plaintiff must make a "reasonable inquiry" into the facts underlying the taking claim, "exercise diligence," and "take reasonable steps to look into" any facts which would put the plaintiff on notice of the taking. *Tex. Nat. Bank*, 86 Fed. Cl. at 414. Here, plaintiff made reasonable inquiry into the government's position regarding plaintiff's property in August and September 2013, as demonstrated by plaintiff's continuous communications with U.S. government personnel. *See* Zaland Declaration at 16–22. After plaintiff observed some ANA personnel using its property and attempted further communications with the USACE in December 2013, plaintiff was informed it would get the property back on 4 January 2014. Zaland Declaration at 3. Although the Court is not able to discern from the record the exact date of the last communication between plaintiff and the government, the government did not eventually fulfill its promise, and plaintiff was eventually informed the government had given plaintiff's property to the ANA and plaintiff "should not ask about this matter anymore." *Id.*

In conclusion, reading all facts and drawing all reasonable inferences in plaintiff's favor, the government's actions were not sufficiently "open and notorious" to put plaintiff on inquiry of its possible injury until December 2013 at the earliest, when plaintiff observed ANA personnel using its property. *Ingrum*, 560 F.3d at 1314 (quoting *Coastal Petroleum*, 228 Ct. Cl. at 867

(1981)) ("Where the actions of the government are open and notorious . . . plaintiff is on inquiry as to its possible injury."). As plaintiff's equipment was in the government's possession since at least 2011, the fact the government denied plaintiff access to its property in July 2013 is not sufficient to establish inquiry notice. Indeed, the government itself, during oral argument, acknowledged the alleged accrual date may instead be as late as September 2013. *See* Mot. to Dismiss at 10; Tr. at 65:17–19. The repeated misleading or inconclusive statements by government personnel, including the emails from Mr. Hughes and Captain Finlay informing plaintiff they were investigating the matter, as well as the USACE's promise that plaintiff could receive its property back, renders the government's taking of plaintiff's property "inherently unknowable" to plaintiff until December 2013 at the earliest, when plaintiff was put on inquiry by observing ANA personnel using its property. *See Ingrum*, 560 F.3d at 1314–1315; *see also Petro-Hunt, L.L.C.*, 90 Fed. Cl. at 61–62, *Tex. Nat. Bank*, 86 Fed. Cl. at 414. Accordingly, the Court finds the "accrual suspension rule" applies in this instance, and the accrual of plaintiff's claim against the United States was suspended until December 2013 at the earliest. *Ingrum*, 560 F.3d at 1314. Based on the current record, the Court is not able to ascertain the exact accrual date at this stage in the proceeding, whether it was in December 2013 or January 2014. As plaintiff filed the complaint on 27 November 2019, neither date bars plaintiff's claim under the statute of limitations.[6]

### C. Conclusion Regarding Statute of Limitations

As both parties agree the government deprived plaintiff of the use and enjoyment of its property since July 2013, plaintiff's takings claim against the United States government would have accrued in July 2013 absent suspension. *See Causby*, 328 U.S. at 261–62. The accrual date, however, was suspended until December 2013 at the earliest due to the repeated misleading or inconclusive statements made by government personnel rendering plaintiff's takings claim "inherently unknowable" to plaintiff. *See Ingrum*, 560 F.3d at 1314–1315; *see also Petro-Hunt, L.L.C.*, 90 Fed. Cl. at 62, *Tex. Nat. Bank*, 86 Fed. Cl. at 414. Accordingly, construing the record before the Court in the light most favorable to plaintiff, the Court finds the six-year statute of limitations began to run in December 2013, and plaintiff's claim is not barred. *Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993), *N. Hartland, L.L.C. v. United States*, 309 F. App'x 389, 391 (Fed. Cir. 2009).

---

[6] Plaintiff also argues the statute of limitations was stayed until at least December 2013 under the justifiable uncertainty doctrine, which delays the accrual of a takings claim when the government promises to mitigate the damage caused by a taking. Pl.'s Resp. at 6 (citing *Prakhin v. United States*, 122 Fed. Cl. 483, 490 (2015)). The government objects to plaintiff's reliance on the justifiable uncertainty doctrine, arguing the justifiable uncertainty doctrine is an extension of the stabilization doctrine, and the doctrines of stabilization and justifiable uncertainty apply solely to determine the accrual date in cases involving continuous, gradual environmental damage allegedly caused by the government's action. Gov't's Reply at 11 (citing *United States v. Dickinson*, 331 U.S. 745, 67 S. Ct. 1382, (1947) (applying to temporary and permanent flooding of land); *Swartzlander v. United States*, 142 Fed. Cl. 435, 443–44 (2019) (applying to land erosion); *Prakhin* v. United States, 122 Fed. Cl. 483, 485 (2015) (applying to sand accretion); *Banks v. United States*, 120 Fed. Cl. 29, 36 (2015) (applying to erosion)). Plaintiff cannot identify any cases applying the justifiable uncertainty doctrine to personal property. Tr. at 49:1–3. As discussed *supra*, the Court analyzes this case under the accrual suspension rule, specifically regarding the government's "inquiry notice" argument and plaintiff's "inherently unknowable" argument. The Court concludes it is not necessary to analyze whether the statute of limitations bars plaintiff's claims under the justifiable uncertainty doctrine, particularly when neither party can point to an instance of this doctrine being applied in personal property claims.

## VIII.   Conclusion

Plaintiff pleads sufficient substantial connections with the United States to establish standing to sue the government under the Fifth Amendment's Takings Clause, and plaintiff's claim is not barred by the statute of limitations.  Accordingly, the Court **DENIES** the government's motion to dismiss.  The Court further **GRANTS** the plaintiff's motion for leave to file its supplemental paper and **STRIKES** plaintiff's Reply in Support of Supp. Paper, ECF No. 30, from the record.[7]

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge

---

[7] On 17 September 2020, the Court held a telephonic oral argument on the government's motion to dismiss.  *See* Order, ECF No. 21.  During oral argument, the Court raised a factual question regarding whether plaintiff had "any other connectivity with the United States in the past . . . other than the project of work that is described. . .  in the complaint."  Tr. at 24:5–9.  The parties did not raise this legal issue in any of the briefs on the government's motion to dismiss, and plaintiff was not prepared to answer the question at oral argument. *See generally* Am. Compl.; Mot. to Dismiss; Pl.'s Resp; Tr. at 25:7–12.  After oral argument, plaintiff filed a "Supplement to its Opposition" to the government's motion to dismiss "to address the Court's questions during the September 17, 2020 oral argument relating to Plaintiff's work on other U.S. Government projects."  *See* Pl.'s Supplement to Opp. to Def.'s Amended Mot. to Dismiss, ECF No. 26.  The Court struck the supplement, as there is no provision in the Court's Rules for such a filing.  *See* Order, ECF No. 27 ("24 November 2020 Order").  In the 24 November 2020 Order, the Court directed plaintiff to file a motion for leave to file a supplemental paper and for the government to file a response, if any, to plaintiff's motion.  *See id.*  Plaintiff thereafter filed a motion for leave to file a supplemental paper, which the government opposed.  *See* Pl.'s Mot. for Leave; Def.'s Resp. to Pls.'s Mot. for Leave.  The government opposed plaintiff's motion on the grounds it is untimely and because plaintiff's proposed supplemental paper does not aid the Court's analysis.  Def.'s Resp. to Pls.'s Mot. for Leave at 1.  The Court finds the government's objections unpersuasive.  It was not until oral argument when plaintiff was first put on notice that its prior connections to the United States was a relevant legal issue, and thus plaintiff could not have provided such information to the Court prior to or during oral argument.  Plaintiff took a reasonable amount of time to investigate the question and file the supplemental paper, especially considering the likely hardship for an Afghan client to communicate with counsel in the United States.  Additionally, when the government challenges plaintiff's allegations of jurisdiction in a Rule 12(b)(1) motion to dismiss, "the court may consider evidence outside the pleadings to resolve the issue."  *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572 (Fed. Cir. 1996).  Accordingly, the Court grants plaintiff's motion for leave to file its supplemental paper and thereby considers the information contained in plaintiff's proposed supplemental paper in resolving the government's motion to dismiss.  *See King v. United States*, No. 18-1115C, ECF No. 67 (Fed. Cl. Aug. 31, 2020) (granting a similar motion on the ground of good cause shown and finding no prejudice to the non-moving party); *System Fuels, Inc. v. United States*, No. 03-2623C, ECF No. 54 (Fed. Cl. Jan. 28, 2005) (same).  While the Court now grants plaintiff's motion for leave to file its supplemental paper, it observes the 24 November 2020 Order did not permit plaintiff to file a reply to the government's response.  Nevertheless, plaintiff filed a reply in support of its motion for leave to file a supplemental brief on 21 December 2020.  *See* Pl.'s Reply in Supp. of Mot. for Leave to File Supp. Paper, ECF No. 30.  Accordingly, the Court strikes Pl.'s Reply in Support of Mot. for Leave to File Supp. Paper, ECF No. 30, from the record.